IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| UNITED STATES FIRE INSURANCE COMPANY, a Delaware Company,<br><br>　　　　　　　　Plaintiff,<br><br>　　　vs.<br><br>CYANOTECH CORPORATION; NUTREX HAWAII, INC.,<br><br>　　　　　　　Defendants.<br>_____ | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CIV. NO. 12-00537 JMS-BMK<br><br>ORDER GRANTING PLAINTIFF UNITED STATES FIRE INSURANCE COMPANY'S MOTION FOR SUMMARY JUDGMENT |

## ORDER GRANTING PLAINTIFF UNITED STATES FIRE INSURANCE COMPANY'S MOTION FOR SUMMARY JUDGMENT

## I. INTRODUCTION

In this action, Plaintiff United States Fire Insurance Company ("U.S. Fire") seeks a declaration under 28 U.S.C. § 2201 that it owes no duty to defend or indemnify its policyholders Cyanotech Corporation ("Cyanotech") and Nutrex Hawaii, Inc. ("Nutrex") (collectively, "Defendants") against two actions pending in the United States District Court for the Middle District of Florida -- *U.S. Nutraceuticals v. Cyanotech Corp.*, No. 5-12-cv-00266-WTH-TBS (M.D. Fla.) (the "business interference action"), and *U.S. Nutraceuticals v. Cyanotech Corp.*,

No. 5-12-cv-00366OC-10TBS (M.D. Fla.) (the "patent infringement action")

(collectively, the "underlying actions").

Federal jurisdiction is proper under 28 U.S.C. § 1332 based upon

diversity of citizenship -- U.S. Fire is a Delaware Corporation with its principal

place of business in Morristown, New Jersey; Cyanotech is a Nevada Corporation

with its principal place of business in Kailua-Kona, Hawaii; and Nutrex is a wholly

owned subsidiary of Cyanotech.  Doc. No. 1, Compl. ¶¶ 2-4.

Before the court is U.S. Fire's Motion for Summary Judgment,

seeking rulings as a matter of law that U.S. Fire has no duty to defend and/or

indemnify Defendants against either of the underlying actions, including claims for

compensatory damages, for declaratory relief of patent infringement, and for

punitive damages.  Based on the following, the court concludes that the underlying

actions do not raise the potential for indemnification liability, and thus U.S. Fire

has no duty to defend the actions.  Accordingly, the court GRANTS U.S. Fire's

Motion for Summary Judgment.

## II. <u>BACKGROUND</u>

### A.    Factual Background

The court begins by setting forth the essential facts and claims alleged

against Defendants in the underlying actions, which are assumed to be true for

2

purposes of this declaratory relief action.  *See, e.g.*, *Burlington Ins. Co. v. Oceanic Design & Constr., Inc.*, 383 F.3d 940, 944-45 (9th Cir. 2004) ("The focus is on the alleged claims and facts.").  The court then sets forth potentially relevant provisions of U.S. Fire's insurance policy.

### 1.    *The Business Interference Action*

Astaxanthin is "a highly potent antioxidant compound used as a dietary supplement to ameliorate free radical and light-induced retinal damage and age-inducted macular degeneration," among other claimed human health benefits.  Doc. No. 17-2, Pl.'s Ex. 1, ¶ 7.  Among other things, Cyanotech operates "algae farms used to grow *Haematococcus pluvialis*, an algae from which astaxanthin is extracted."  Doc. No. 17-3, Pl.'s Ex. 2, ¶ 9.  In 2010, Cyanotech and U.S. Nutraceuticals, LLC, d/b/a Valensa International ("Valensa") entered into "a Biomass Supply Agreement, under which Cyanotech agreed to sell, and Valensa agreed to purchase, certain quantities of *Haematococcus pluvialis* biomass."  Doc. No. 17-2, Pl.'s Ex. 1, ¶ 9.  This Biomass Supply Agreement continued a business relationship between Cyanotech and Valensa that had apparently begun in 2007, "whereby Cyanotech agreed to sell a minimum quantity of astaxanthin biomass each calendar quarter to Valensa."  *Id.* ¶ 8.

"Valensa is a life science-based inventor, developer and provider of high quality botanically sourced products for human health." *Id.* ¶ 6.  In 2002, Valensa acquired the assets of La Haye Laboratories, Inc. ("La Haye"), which "was known as one of the successful early promoters and sellers of astaxanthin." *Id.* ¶ 7. "La Haye had successfully secured patents for astaxanthin's use in mitigating the effects of macular degeneration and improving human health." *Id.* Thus, "by 2009, Valensa had become a leading producer of astaxanthin oleoresin extracts and had developed technology that dramatically improved the stability and shelf-life of [astaxanthin]." *Id.*

"Beginning in 2011, Valensa entered into a relationship with the Mercola Group whereby Valensa sold astaxanthin extract product to the Mercola Group." *Id.* ¶ 10.  In February 2011, "Dr. Joseph Mercola, a nationally recognized alternative medicine thought leader, appeared on the Dr. Oz show to extoll the virtues of astaxanthin[.]" *Id.*  This appearance "had an extraordinary effect in terms of astaxanthin sales demand[.]" *Id.*  "By the third quarter of 2011, Valensa's sales of astaxanthin based formulations to the Mercola Group had increased dramatically[.]" *Id.*

"During the course of the Valensa/Cyanotech business relationship, Cyanotech learned of Valensa's relationship with the Mercola Group and the fact

that Valensa supplied astaxanthin based formulations to the Mercola Group." *Id.*
¶ 11. "Further, Cyanotech learned that a large part of the astaxanthin Valensa sold
to the Mercola Group came from astaxanthin biomass purchased by Valensa from
Cyanotech." *Id.*

      "Despite being acutely aware of Valensa's business relationship with
the Mercola Group, Cyanotech used confidential information it learned about the
Valensa/Mercola Group business relationship and took willful, deliberate, and
improper steps to interfere with, and destroy this relationship." *Id.* ¶ 14. "For
instance, using confidential information regarding the Valensa/Mercola Group
business relationship, Cyanotech directly approached the Mercola Group in 2011
and offered the Mercola Group significant discounts and/or rebates on astaxanthin
oleoresin sales." *Id.* "Cyanotech represented to the Mercola Group that Cyanotech
was the sole source of all astaxanthin biomass to Valensa. *Id.* ¶ 15. Cyanotech
knew this representation was false and the false statement was designed solely to
destroy the business relationship between Valensa and the Mercola Group. *Id.*

      "Cyanotech also used confidential information it learned from
Valensa about the Valensa/Mercola Group business relationship and in the first
quarter of 2012 made a conscious decision to stop supplying astaxanthin biomass
to Valensa and to sell Cyanotech oleoresin directly to the Mercola Group[.]" *Id.*

¶ 16.  "As a direct and proximate result of Cyanotech's use of Valensa's confidential information and interference, the Mercola Group has advised Valensa that it no longer wishes to purchase its highest demand item -- Valensa's advanced asta-perilla formulated product -- from Valensa."  *Id.*

Based on those factual allegations, Valensa filed the business interference action against Cyanotech in Florida, where Valensa is located.  The action is pending in the U.S. District Court for the Middle District of Florida.[1]  An Amended Complaint, filed on June 6, 2012, alleges two Counts -- Tortious Interference with a Business Relationship (Count One), and Breach of Confidentiality Agreement (Count Two).  *Id.* at 6-7.  Count One alleges, in pertinent part:

> Cyanotech intentionally, improperly and without justification interfered with the relationship between Valensa and the Mercola Group by approaching the Mercola Group in an effort to sell its astaxanthin product directly to the Mercola Group and by misrepresenting to the Mercola Group that Cyanotech was the sole source of all astaxanthin biomass to Valensa.  Cyanotech also offered to sell the astaxanthin product directly to the

---

[1]  The business interference action was originally filed in a Florida state court, and Cyanotech removed it to federal court.  After removal, Valensa filed the operative Amended Complaint, a copy of which is provided as Exhibit One to U.S. Fire's Concise Statement of Facts.  *See* Doc. No. 17-2.  According to the federal court's PACER system, that Florida action was stayed in the district court on July 15, 2013, pending an interlocutory appeal of an Order denying a motion to compel arbitration.  As of October 22, 2013, no further district court proceedings have occurred in the business interference action.

> Mercola Group, thereby freezing out Valensa, and
> offered discounts or rebates to the Mercola Group so that
> the Mercola Group would no longer purchase the
> asta-perilla product from Valensa.  As a result of
> Cyanotech's intentional and unjustified interference, the
> Mercola Group has informed Valensa that it will no
> longer purchase Valensa's asta-perilla formulated
> product.

*Id.* ¶ 23.  It further asserted:

> As a direct and proximate result of Cyanotech's
> intentional and unjustified interference with Valensa's
> relationship with the Mercola Group, Valensa has been
> damaged in the State of Florida.  These damages include,
> but are not limited to, loss of business reputation, lost
> sales of Valensa's asta-perilla product to the Mercola
> Group and lost profits.

*Id.* ¶ 26.  And Count Two alleges in pertinent part:

> Article 7 of the Biomass Supply Agreement (Exhibit "A"
> hereto) contains a confidentiality provision which
> provides, in relevant part:

>> In the course of business between the two Parties,
>> each Party may obtain information from the other
>> that is of a confidential and proprietary nature.
>> Such confidential and proprietary information may
>> include, but is not limited to, trade secrets,
>> know-how, inventions, techniques, processes,
>> computer programs, schematics, data, **customer
>> information**, vendor information, and sales and
>> marketing information.  Both Parties will keep in
>> trust and confidence and not disclose to any third
>> party all such confidential and proprietary
>> information during the term of this Agreement and
>> for as long as such information remains

7

> confidential and proprietary.  **Neither Party will**
> **disclose any confidential and proprietary**
> **information of the other Party to any person or**
> **entity without the other Party's prior written**
> **consent**. (Emphasis added [in the underlying
> complaint.])

*Id.* ¶ 28.  Count Two thus alleges:

> Cyanotech breached the Confidentiality Agreement by
> disclosing confidential and/or proprietary information it
> learned from Valensa to the Mercola Group and other
> persons or entities without first obtaining Valensa's
> written consent.  By improperly disclosing this
> confidential and/or proprietary information, Cyanotech
> was able to undermine the business relationship between
> Valensa and the Mercola Group.

*Id.* ¶ 30.

### 2.    *The Patent Infringement Action*

Prior to Valensa's acquisition of the assets of La Haye in 2002, La

Haye had "secured patents for astaxanthin's use in mitigating the effects of

macular degeneration and improving human health."  *Id.* ¶ 7.  Valensa is thus "an

exclusive licensee" of U.S. Patent No. 5,527,533 (the "'533 Patent" or the "Tso

Patent"), entitled "Method of Retarding and Ameliorating Central Nervous System

and Eye Damage."  Doc. No. 17-3, Pl.'s Ex. 2, at 14.  In particular, the '533 Patent

relates to a method of using or administering astaxanthin for "retarding and

ameliorating central nervous system and eye diseases."  *Id.* at 20.

The '533 Patent lists its inventors as Mark O.M. Tso and Tim-Tak Lam, and its assignee as the Board of Trustees of the University of Illinois ("University of Illinois").  *Id.* at 14.  The patent thus belongs to the University of Illinois.  *Id.* ¶ 4.  As the patent's licensee, Valensa has "the exclusive right to market dietary supplement astaxanthin products under the Tso patent."  *Id.* ¶ 21.

In addition to Cyanotech's production of astaxanthin biomass, "Cyanotech and Nutrex market nutraceutical ingredients and products and directly and indirectly compete against Valensa, particularly with respect to their efforts to manufacture and sell astaxanthin products."  *Id.* ¶¶ 7, 8.  And "[o]n numerous occasions, [Cyanotech and Nutrex] have publicly acknowledged that Dr. Tso was the person responsible for the groundbreaking discovery that astaxanthin offered these benefits, and that these discoveries are the subject of the Tso patent."  *Id.* ¶ 20.

On June 29, 2012, Valensa and the University of Illinois filed the patent infringement action in the U.S. District Court for the Middle District of Florida.  Doc. No. 17-3, Pl.'s Ex. 2.[2]  The patent infringement action alleges a

_____

[2]  Over a week earlier, Cyanotech filed suit in this court against Valensa and the University of Illinois, seeking a declaration of patent *invalidity*, as well as state law claims sounding in bad faith and unfair competition.  *See Cyanotech Corp. v. U.S. Neutraceuticals, LLC*, 2013 WL 504862 (D. Haw. Feb. 7, 2013) (Order Dismissing Action).  This court dismissed that action because the University of Illinois has Eleventh Amendment immunity and did not consent to be sued in Hawaii.  *Id.* at *1.  Because the University of Illinois was a required party

single count of patent infringement under 35 U.S.C. §§ 271, 281-85, against Cyanotech and Nutrex.[3]  The count alleges that Cyanotech and Nutrex "have infringed the Tso patent by manufacturing, offering for sale, selling, and/or importing astaxanthin products with the specific intent and suggestion that users of those products employ them in methods that are covered by one or more claims of the Tso patent."  *Id.* ¶ 23.  "Products that [Cyanotech and Nutrex] have advertised, marketed, sold, and are selling for purposes of performing the methods claimed in the Tso patent include, but are not necessarily limited to," the products "BioAstin Supreme[TM]," and "EyeAstin[TM]."  *Id.*

The patent infringement action further charges that Cyanotech and Nutrex "expressly suggest the use of [their] Astaxanthin Products to perform the methods claimed in the Tso patent.  For example, product labels for [their] Astaxanthin Products include instructions and representations such as the following:"

---

under Federal Rule of Civil Procedure 19, this court dismissed the action without prejudice to Cyanotech raising its claims in the pending Florida patent infringement action.  *Id.*

[3]  Under 35 U.S.C. § 271, "whoever without authority makes, uses, offers to sell, or sells any patented invention . . . infringes the patent."  Further, "patent infringement is a strict liability offense," *In re Seagate Tech., Inc.*, 497 F.3d 1360, 1368 (Fed. Cir. 2007) (en banc), such that "the nature of the offense [such as whether infringement was willful] is only relevant in determining whether enhanced damages are warranted."  *Id.*

- "BioAstin® Hawaiian Astaxanthin - to support eye health."
- "BioAstin® is clinically validated to support eye health in a variety of ways."
- "BioAstin works throughout our entire body - eyes, brain . . . ."
- "BioAstin Hawaiian Astaxanthin provides more protection from damaging effects of free radical or oxidative stress, helping your body to better prevent future oxidative damage."
- "BioAstin works throughout the entire body, our eyes, brain, cardiovascular system, muscles, and skin - everywhere.  It supports a healthy oxidative balance which leads to improvements in many health conditions."
- "EyeAstin™ supports healthy vision and enhances normal eye function.  It helps reduce eye fatigue and strain from reading or long hours spent on the computer."
- "EyeAstin™ is the world's most comprehensive eye health formula."
- "EyeAstin is formulated . . . to protect eyes [from damage from UV light] and maintain eye health."

*Id.* ¶ 24.  The action alleges that Cyanotech and Nutrex also "have suggested the use of [their] Astaxanthin Products to protect and improve vision in sales pitches and public presentations."  *Id.* ¶ 25.

Similarly, the patent infringement action alleges infringement because Cyanotech and Nutrex "also instruct customers and consumers to use [their] Astaxanthin Products to improve and protect vision through their advertising and marketing materials" such as promoting their products on their websites.  *Id.* ¶ 26.  They have thus "expressly exploited, and continue to exploit,

11

Dr. Tso's patented discoveries in an effort to promote the sale of their own, unlicensed products to both retail and industry consumers, knowing that the uses to which they are instructing their customers to put their products infringe the Tso patent." *Id.*

It alleges that the infringement was knowing and willful: "As Defendants' own marketing materials touting Dr. Tso's discoveries, and referencing the Tso patent confirm, [they] have been aware of the Tso patent and the subject matter claimed therein for years." *Id.* ¶ 28. "[L]ong before filing this suit, and on numerous occasions, Valensa warned [them] that their actions violated the Tso patent, and asked [them] to cease and desist from further efforts to exploit the methods claimed in the Tso patent for their own gain." *Id.* They "flouted Valensa's pleas, and continued to instruct their customers to infringe the Tso patent." *Id.*

Further, Cyanotech and Nutrex "knew, and/or were willfully blind to the fact that []their instructions for, and advertised uses of, [their] Astaxanthin Products resulted in direct infringement of the Tso patent." *Id.* ¶ 29. "[They] have induced infringement of, and continue to induce infringement of, the Tso patent, by making, using, importing, selling and/or offering for sale [their] Astaxanthin Products with instructions to perform, and pursuant to advertisements touting,

methods covered by the Tso patent." *Id.* ¶ 30.  "Despite having knowledge of the Tso patent, [they] knowingly continued to induce the infringement of the Tso patent, and such infringement is willful." *Id.* ¶ 31.  "[They] continued to sell and market [their] Astaxanthin Products for use in the claimed methods despite a high likelihood that such sale and marketing infringed valid and enforceable claims of the Tso patent, and [they] knew or should have known that their actions constituted a high likelihood of infringement." *Id.*

### 3.    *The Relevant Policy Language*

U.S. Fire issued identical commercial general liability ("CGL") insurance policies to Defendants, covering the periods April 1, 2011 to April 1, 2012, and April 1, 2012 to April 1, 2013.  Doc. Nos. 17-4, 17-5, Pl.'s Exs. 4, 5. At issue is "Coverage B" of those CGL policies, providing coverage for "personal and advertising injury liability" as follows:[4]

**COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY**

---

[4] U.S. Fire's Motion also raises "Coverage A" of the policy regarding "bodily injury" and "property damage" liability, pointing out that there is no potential for coverage under those provisions because, among other reasons, there are no factual allegations that could constitute an "occurrence," "bodily injury," or "property damage" within the meaning of the policy. Defendants have forthrightly conceded -- both by not opposing the argument in its written Opposition and orally at the hearing on this Motion -- that there is no coverage under "Coverage A," and Defendants instead focus on "Coverage B."  The court thus sets forth only the potentially relevant policy language under "Coverage B."

1. **Insuring Agreement**

   **a.**   We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies.  We will have the right and duty to defend the insured against any "suit" seeking those damages.  However, we will have no duty to defend the insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply.  We may, at our discretion, investigate any offense and settle any claim or "suit" that may result.  But:

   **(1)**   The amount we will pay for damages is limited as described in Section **III** -- Limits Of Insurance; and

   **(2)**   Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B** or medical expenses under Coverage **C**.

   No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments -- Coverage **A** and **B**.

   **b.**   This insurance applies to "personal and advertising injury" caused by an offense arising out of your business but only if the offense was committed in the "coverage territory" during the policy period.

Doc. No. 17-4, Pl.'s Ex. 3 at 30.  This "personal and advertising injury liability,"

however, is limited by, among others, the following exclusions:

14

## 2.     Exclusions

This insurance does not apply to:

**a.     Knowing Violation of Rights of Another**

"Personal and advertising injury" caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury".

. . . .

**e.     Contractual Liability**

"Personal and advertising injury" for which the insured has assumed liability in a contract or agreement.  This exclusion does not apply to liability for damages that the insured would have in the absence of the contract or agreement.

**f.     Breach of Contract**

"Personal and advertising injury" arising out of a breach of contract, except an implied contract to use another's advertising idea in your "advertisement".

. . . .

**i.     Infringement Of Copyright, Patent, Trademark Or Trade Secret**

"Personal and advertising injury" arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights. Under this exclusion, such other intellectual property rights do not include the use of another's advertising idea in your "advertisement".

However, this exclusion does not apply to infringement, in your "advertisement", of copyright, trade dress or slogan.

*Id.* The policies also contain the following relevant definitions:

## SECTION V -- DEFINITIONS

**1**.     "Advertisement" means a notice that is broadcast or published in the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters. . . .

. . . .

**3**.     "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

. . . .

**9**.     "Insured contract" means:

   **a**.     A contract for a lease of premises. . . .

   **b**.     A sidetrack agreement.

   **c**.     Any easement or license agreement[.]

   **d**.     An obligation, as required by ordinance, to indemnify a municipality[.]

   **e**.     An elevator maintenance agreement.

   **f**.     That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization. . . .

. . . .

**13**.     "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

16

**14.**   "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:

  **a**.   False arrest, detention or imprisonment;

  **b**.   Malicious prosecution;

  **c**.   The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor.

  **d**.   Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

  **e**.   Oral or written publication, in any manner, of material that violates a person's right of privacy;

  **f**.   The use of another's advertising idea in your "advertisement"; or

  **g**.   Infringing upon another's copyright, trade dress or slogan in your "advertisement".

*Id.* at 36-39.

**B.   Procedural History**

After the underlying actions were filed in June 2012, Defendants tendered them to U.S. Fire on August 7, 2012.  Doc. No. 20-3, Defs.' Ex. A at 9. By letter of October 4, 2012, U.S. Fire notified Defendants that it was providing a

17

defense, subject to a reservation of rights.  *Id.*  Simultaneously, U.S. Fire filed this declaratory relief action seeking "a binding declaration that [U.S. Fire] has no duty to defend or indemnify Cyanotech or Nutrex for the claims asserted in the Business Interruption and Patent Infringement Actions."  Doc. No. 1, Compl. at 14.

On July 30, 2013, U.S. Fire filed its Motion for Summary Judgment. Doc. No. 16.  Defendants filed an Opposition on September 30, 2013, Doc. No. 19, and U.S. Fire filed its Reply on October 7, 2013.  Doc. No. 22.  The court heard the Motion on October 21, 2013.

## III.  <u>STANDARD OF REVIEW</u>

Summary judgment is proper where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  Rule 56(a) mandates summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Broussard v. Univ. of Cal. at Berkeley*, 192 F.3d 1252, 1258 (9th Cir. 1999).

"A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine

issue of material fact." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007) (citing *Celotex*, 477 U.S. at 323); *see also Jespersen v. Harrah's Operating Co.*, 392 F.3d 1076, 1079 (9th Cir. 2004).  "When the moving party has carried its burden under Rule 56[(a)], its opponent must do more than simply show that there is some metaphysical doubt as to the material facts [and] come forward with specific facts showing that there is a *genuine issue for trial*."  *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586-87 (1986) (citation and internal quotation signals omitted); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (stating that a party cannot "rest upon the mere allegations or denials of his pleading" in opposing summary judgment).

"An issue is 'genuine' only if there is a sufficient evidentiary basis on which a reasonable fact finder could find for the nonmoving party, and a dispute is 'material' only if it could affect the outcome of the suit under the governing law." *In re Barboza*, 545 F.3d 702, 707 (9th Cir. 2008) (citing *Anderson*, 477 U.S. at 248).  When considering the evidence on a motion for summary judgment, the court must draw all reasonable inferences on behalf of the nonmoving party. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587; *see also Posey v. Lake Pend Oreille Sch. Dist. No. 84*, 546 F.3d 1121, 1126 (9th Cir. 2008) (stating that "the evidence

of [the nonmovant] is to be believed, and all justifiable inferences are to be drawn in his favor." (citations omitted)).

## IV. <u>ANALYSIS</u>

Hawaii substantive law applies in this suit based upon diversity jurisdiction. *See, e.g.*, *Burlington Ins. Co.*, 518 F. Supp. 2d at 1246; *Apana v. TIG Ins. Co.*, 504 F. Supp. 2d 998, 1003 (D. Haw. 2007). And "[i]n the absence of controlling state law, a 'federal court sitting in diversity must [generally] use its own best judgment in predicting how the state's highest court would decide the case.'" *Apana*, 504 F. Supp. 2d at 1003 (quoting *Tirona v. State Farm Mut. Auto. Ins. Co.*, 812 F. Supp. 1083, 1085 (D. Haw. 1993) (citations omitted)). "In so doing, a federal court may be aided by looking to well-reasoned decisions from other jurisdictions." *Id.* (quoting *Takahashi v. Loomis Armored Car Serv.*, 625 F.2d 314, 316 (9th Cir. 1980)). The court thus outlines the legal framework under Hawaii law used to interpret the Policy and to determine the scope of an insurer's coverage duties, and then addresses the parties' arguments.

### A.      Framework for Construing Insurance Contracts

"Every insurance contract shall be construed according to the entirety of its terms and conditions as set forth in the policy, and as amplified, extended, restricted, or modified by any rider, endorsement or application attached to and

made a part of the policy."  Hawaii Revised Statutes ("HRS") § 431:10-237.  Thus,

Hawaii law looks to the plain language of the insurance policy to determine the

scope of an insurer's duties.  *See, e.g.*, *Sentinel Ins. Co. v. First Ins. Co. of Haw.*,

76 Haw. 277, 287, 875 P.2d 894, 904 (1994); *see also Hawaiian Ins. & Guar. Co.*

*v. Fin. Sec. Ins. Co.*, 72 Haw. 80, 87, 807 P.2d 1256, 1260 (1991) ("In the context

of insurance coverage disputes, we must look to the language of the insurance

policies themselves to ascertain whether coverage exists, consistent with the

insurer and insured's intent and expectations."); *Burlington Ins. Co.*, 383 F.3d at

945 ("In Hawaii, the terms of an insurance policy are to be interpreted according to

their plain, ordinary, and accepted sense in common speech.").

        Nevertheless, insurance policies must be construed "in accordance

with the reasonable expectations of a layperson."  *Hawaiian Isle Adventures, Inc.*

*v. N. Am. Capacity Ins. Co.*, 623 F. Supp. 2d 1189, 1194 (D. Haw. 2009) (citing

*Dawes v. First Ins. Co. of Haw.*, 77 Haw. 117, 121, 883 P.2d 38, 42 (1994)).

Insurance contracts are "contracts of adhesion" and Hawaii law "ha[s] long

subscribed to the principle that [insurance contracts] must be construed liberally in

favor of the insured and any ambiguities must be resolved against the insurer."

*Guajardo v. AIG Haw. Ins. Co.*, 118 Haw. 196, 202, 187 P.3d 580, 586 (2008)

(citing *Dairy Rd. Partners v. Island Ins. Co.*, 92 Haw. 398, 411-12, 992 P.2d 93, 106-07 (2000) (internal citations, quotation marks, brackets, and ellipses omitted)).

An insurer's duty to defend is broader than its duty to indemnify and "arises whenever there is the mere potential for coverage." *Commerce & Indus. Ins. Co. v. Bank of Haw.*, 73 Haw. 322, 326, 832 P.2d 733, 735 (1992) (citations omitted). "In other words, the duty to defend 'rests primarily on the *possibility* that coverage exists. This possibility may be remote but if it exists[,] the [insurer] owes the insured a defense.'" *Dairy Rd. Partners*, 92 Haw. at 412, 992 P.2d at 107 (quoting *Standard Oil Co. of Cal. v. Hawaiian Ins. & Guar. Co.*, 65 Haw. 521, 527, 654 P.2d 1345, 1349 (1982)).

In determining whether an insurer has a duty to defend, Hawaii courts apply the "complaint allegation rule," where

> [t]he focus is on the alleged claims and facts. The duty to defend "is limited to situations where the pleadings have alleged claims for relief which fall within the terms for coverage of the insurance contract. 'Where pleadings fail to allege any basis for recovery within the coverage clause, the insurer has no obligation to defend.'"

*Burlington Ins. Co.*, 383 F.3d at 944-45 (quoting *Hawaiian Holiday Macadamia Nut Co. v. Indus. Indem. Co.*, 76 Haw. 166, 169, 872 P.2d 230, 233 (1994)). "In determining whether coverage exists under a liability policy, Hawaii courts do not look at the way a litigant states a claim, but rather at the underlying facts alleged in

22

the pleadings." *Allstate Ins. Co. v. Miller*, 732 F. Supp. 2d 1128, 1134 (D. Haw. 2010) (citing *Bayudan v. Tradewind Ins. Co.*, 87 Haw. 379, 387, 957 P.2d 1061, 1069 (Haw. App. 1998)); *see also Dairy Rd. Partners*, 92 Haw. at 417, 992 P.2d at 112 ("[W]hen the *facts* alleged in the underlying complaint unambiguously exclude the possibility of coverage, conclusory assertions contained in the complaint regarding the legal significance of those facts (such as that the facts as alleged demonstrate 'negligent' rather than 'intentional' conduct) are insufficient to trigger the insurer's duty to defend.").

Thus, to obtain summary judgment that it has no duty to defend, an insurer has the burden of proving that there is "no genuine issue of material fact with respect to whether a *possibility* exist[s]" that the insured will incur liability for a claim covered by the policy. *Dairy Rd. Partners*, 92 Haw. at 412, 992 P.2d at 107. In other words, the insurer must prove that it is not possible for the plaintiff in the underlying lawsuit to prevail against insured on a claim that is covered by the Policy. *See id.* at 412-13, 992 P.2d at 107-08. "All doubts as to whether a duty to defend exists are resolved against the insurer and in favor of the insured." *Id.* at 412, 992 P.2d at 107.

**B.     Application of Framework to "Coverage B" for "Advertising Injury"**

Defendants assert that there is a potential for indemnification liability as to both underlying actions because they allege wrongdoing in "advertising."  For example, the patent infringement action alleges that much of the alleged infringement occurred when Defendants "advertised, marketed, sold," or "offered [their astaxanthin products] for sale," "with the specific intent and suggestion that users of those products employ them in methods covered by one or more claims of the Tso patent."  Doc. No. 17-3, Pl.'s Ex. 2, ¶ 23.  It similarly alleges that infringement occurred when "Defendants . . . instruct customers and consumers to use Defendants' Astaxanthin Products to improve and protect vision through their advertising and marketing materials."  Doc. No. 17-2, Pl.'s Ex. 2, ¶ 26.  And the business interference action alleges that Defendants breached the confidentiality agreement by, among other ways, misusing "customer" and "sales and marketing information" -- which Defendants contend raises a potential for "advertising injury."  Given those types of factual allegations, Defendants assert that there is a duty to defend under Coverage B.

Congress amended 35 U.S.C. § 271 in 1994 to include "offers to sell" as a type of patent infringement.  *See* 35 U.S.C. § 271 ("whoever without authority makes, uses, *offers to sell*, or sells any patented invention within the United States .

24

. . during the time for the patent, therefore, infringes the patent") (emphasis added).

Caselaw has thus recognized that this type of patent infringement ("offers to sell")

might plausibly occur in the course of "advertising."  *See, e.g.*, *Homedics, Inc. v.*

*Valley Forge Ins. Co.*, 315 F.3d 1135, 1139 (9th Cir. 2003) ("With the addition of

'offers to sell' to the patent statute, it is no longer clear that advertising can never

give rise to a direct patent infringement action.") (citations omitted).  But this does

not mean such infringement is necessarily "advertising injury" as contemplated in

a CGL policy.  Instead, the court looks to the plain language of the policy to

determine whether such allegations create a potential for indemnification liability

sufficient to trigger a duty to defend.

### 1.     *The Underlying Actions Do Not Fit Within the Policy's Definition of Covered "Personal and Advertising Injury"*

Paragraph 14 of Section V, Coverage B, defines covered "personal

and advertising injury" as "injury, including consequential 'bodily injury', arising

out of one or more of the following offenses:"  Doc. No. 17-4, Pl.'s Ex. 3 at 38.

The definition then lists seven "offenses" that constitute covered injury (including

matters that cannot possibly apply in this case, such as false arrest, malicious

prosecution, and slander or libel).  *Id.*  The only two listed offenses that merit

discussion here are paragraph 14f ("The use of *another's advertising idea* in your

'advertisement'") (emphasis added) and paragraph 14g ( "Infringing upon

25

another's *copyright, trade dress or slogan* in your 'advertisement'") (emphasis added).  But neither of these paragraphs applies.

> a.    *Paragraph 14f*

As emphasized, paragraph 14f only provides coverage if an insured uses "another's advertising idea."  And although the patent infringement action alleges infringement by, among other activities, "advertising" by Defendants, there are absolutely no facts alleged that indicate that Defendants misappropriated, sold, offered, or otherwise improperly used, Valensa's "*advertising ideas*" in their alleged infringement of the Tso patent.  The Tso patent concerns uses or methods of administering astaxanthin for ameliorating and preventing photic damage.  Nothing in the Tso patent could possibly be construed as constituting an "advertising idea" about astaxanthin.  In short, the patent is about the use and administration of astaxanthin, not about methods of advertising.

Ample caselaw -- which the court finds to be well-reasoned and believes the Hawaii Supreme Court would apply -- supports this interpretation.  These authorities consistently conclude that allegations of patent infringement (even if allegations also involve advertisements of a patented invention) cannot constitute "advertising injury" sufficient to trigger insurance coverage under a CGL policy, unless the patented idea itself concerns a method of advertising.  *See*

*Homedics*, 315 F.3d at 1140-41 (holding that because the underlying actions "do not allege a violation of a method patent involving advertising ideas," there is no "advertising injury" for purposes of insurance coverage); *Hyundai Motor Am. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 600 F.3d 1092, 1100-01 (9th Cir. 2010) ("[P]atent infringement can qualify as an advertising injury if the patent 'involve[s] any process or invention which could reasonably be considered an "advertising idea," or . . . if the third party "allege[d] violation of a method patent involving advertising ideas[.]" ") (citing *Homedics*, 315 F.3d at 1141, and *Mez Indus., Inc. v. Pac. Nat'l Ins. Co.*, 90 Cal. Rptr. 2d 721, 733 (Cal. App. 1999)); *Green Mach. Corp. v. Zurich-American Ins. Grp.*, 313 F.3d 837, 840 (3d Cir. 2002) ("Advertising injury, is not . . . the same thing as advertising per se.  Advertising injury is the misappropriation of another's advertising idea or concept."); *United States Fid. & Guar. Co. v. Frosty Bites, Inc.*, 232 F. Supp. 2d 101, 105 (S.D.N.Y. 2002) ("Thus, a patent, which relates to the product itself or the method of making it, would not fall into the phrase[] 'advertising idea' . . . and could not fall within the definition of advertising injury."); *Nat'l Union Fire Ins. Co. of Pittsburgh v. United Catalysts, Inc.*, 182 F. Supp. 2d 608, 611 (W.D. Ky. 2002) (concluding that "patent infringement does not constitute 'advertising injury,'" even after the 1994 amendment to the Patent Act); *Everett Assocs. v. Transcontinental Ins. Co.*, 159 F.

Supp. 2d 1196, 1207-08 (N.D. Cal. 2001) (reiterating that "advertising injury does

not include 'offer to sell' patent infringement," despite the 1994 amendment)

(citing numerous cases).  As these cases demonstrate, there is no coverage under

paragraph 14f.

> b.     *Paragraph 14g*

A covered injury occurs under paragraph 14g only when an insured

"[i]nfring[es] upon another's *copyright, trade dress or slogan* in your

'advertisement.'"  This definition conspicuously and plainly omits "patent"

infringement.  Defendants are not alleged to have infringed in any manner a

Valensa "copyright, trade dress or slogan."  If the policy was meant to cover

"patent" infringement, the term would have been included in that clause.  *See, e.g.*,

*Everett Assocs.*, 159 F. Supp. 2d at 1208 ("A claim for patent infringement is . . . a

distinct legal claim governed by a vast body of statutory and case law. . . .  The

absence of any express reference to patent infringement in the policy would lead a

reasonable layperson to the conclusion that patent infringement is not covered.")

(citation omitted).

> 2.     ***The Policy Specifically Excludes "Patent Infringement" from "Advertising Injury"***

Moreover, even if there were some ambiguity as to whether patent

infringement could constitute "advertising injury," Coverage B also contains a

28

specific exclusion for patent infringement.  Paragraph 2i of Coverage B plainly

states:

> This insurance does not apply to:
>
> **i.      Infringement Of Copyright, Patent, Trademark Or Trade Secret**
>
> "Personal and advertising injury" arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights.  *Under this exclusion, such other intellectual property rights do not include the use of another's advertising idea in your "advertisement."*
>
> However, this exclusion does not apply to infringement, in your "advertisement", of copyright, trade dress or slogan.

Doc. No. 17-4, Pl.'s Ex. 3 at 30 (emphasis added).

This exclusion unambiguously bars injury arising out of patent

infringement.  Aware of this obvious exclusion, Defendants attempt to fit within

the emphasized exception to the exclusion, which refers to "use of another's

advertising idea" (consistent with the "personal and advertising injury" definition

analyzed above).  But this argument fails for two reasons.  Initially, the exception

does not apply to "patent infringement" -- it only applies to "other intellectual

property rights."  Second, it fails for the same reason that there is no covered

"advertising injury" in the first place -- as analyzed above, there are no factual

allegations in either underlying action that Defendants used a Valensa "advertising idea." That is, Defendants are not alleged to have used an "advertising idea" either in infringing on the Tso patent or in violating a contractual provision not to reveal or misuse confidential information.

Likewise, the court easily rejects Defendants' argument that an "advertising injury" is possible based upon the business interference action's recitation of the confidentiality provision contained in the Biomass Supply Agreement between Valensa and Cyanotech, which mentions "sales and marketing" information. Doc. No. 17-2, Pl.'s Ex. 1, ¶ 28. Nothing in the business inference action suggests that any "advertising ideas" were a part of the confidential sales and marketing information allegedly used by Defendants to tortiously interfere with the Valensa/Mercola Group contract. Moreover, a violation of the confidentiality provision is plainly excluded from Coverage B, as explained next.

### 3.   Coverage B's "Breach of Contract" and "Knowing Violation" Exclusions Also Bar Coverage for the Business Interference Action

Finally, coverage is also barred by Exclusions 2a ("Knowing Violation of Rights of Another") and 2f ("Breach of Contract"). Specifically, Coverage B excludes: "'Personal and advertising injury' caused by or at the direction of the insured with the knowledge that the act would violate the rights of

another and would inflict 'personal and advertising injury.'"  Doc. No. 17-4, Pl.'s

Ex. 3, at 30 ¶ 2a.  And it excludes:  "'Personal and advertising injury' arising out

of a breach of contract, except an implied contract to use another's advertising idea

in your 'advertisement.'"  *Id.* ¶ 2f.

The business interference action alleges that Cyanotech intentionally

and knowingly interfered with the Valensa/Mercola Group business relationship.

The underlying complaint clearly alleges that Cyanotech was "acutely aware of"

the business relationship, and took "willful steps" to "destroy this relationship."

Doc. No. 17-2, Pl.'s Ex. 1, ¶ 14.  Such allegations are plainly barred by Exclusion

2a ("with the knowledge that the act would violate. . .").  Likewise, the business

interference action seeks damages "[a]s a direct and proximate result of

Cyanotech's breach of the Confidentiality Agreement and disclosure of

confidential and/or proprietary information."  *Id*. ¶ 31.  By such a breach,

"Cyanotech was able to undermine the business relationship between Valensa and

the Mercola Group."  *Id*. ¶ 30.  Such allegations "aris[e] out of a breach of

contract," and are barred by Exclusion 2f.

In short, even if there were a question whether Defendants' alleged

misuse of Valensa's confidential information could include a Valensa "advertising

idea," coverage is otherwise excluded from Coverage B.

## V.  **CONCLUSION**[5]

For the foregoing reasons, the court GRANTS Plaintiff United States Fire Insurance Co.'s Motion for Summary Judgment.  Doc. No. 16.  Plaintiff owes no coverage duties as to the underlying complaints.  Judgment shall issue in favor of Plaintiff.  The Clerk of Court is directed to close the case file.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, October 23, 2013.



/s/ J. Michael Seabright
J. Michael Seabright
United States District Judge

*United States Fire Ins. Co. v. Cyanotech Corp., et al.*, Civ. No. 12-00537 JMS-BMK, Order Granting Plaintiff United States Fire Insurance Company's Motion for Summary Judgment

---

[5] Defendants requested, in the alternative, that -- if the court concludes that U.S. Fire has no duty to defend -- the court declare that U.S. Fire nevertheless had a duty to defend from the time of tender until this court's ruling.  Such a request essentially seeks a declaration that precludes U.S. Fire from seeking reimbursement for defense costs.  But U.S. Fire's Complaint does not seek reimbursement, and Defendants have not filed a counterclaim seeking a declaration preventing reimbursement.  The issue is thus not properly before the court.  In any event, U.S. Fire specifically represented at the hearing that it does not, and will not, seek reimbursement for defense costs while it was defending under a reservation of rights in this case.  Thus, Defendants' alternative request is moot.